# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **BRENDA F. BREWER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 2:04-0076** |
| **v.** | ) | **Judge Nixon / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |


## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff

was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended.

The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record.

Docket Entry No. 13. Defendant has filed a Response, arguing that the decision of the

Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No.

16.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for

Judgment on the Administrative Record be GRANTED, and that this action be REMANDED.

1

# I. INTRODUCTION

Plaintiff filed her application for SSI on March 12, 2001, and her application for DIB on March 23, 2001, alleging that she had been disabled since March 1, 2001, due to arthritis, a disc in her neck that pressed on a nerve, and pain and fatigue in her arm, neck, shoulder, and legs.[1] Docket Entry No. 9, Attachment ("TR"), TR 17; 57; 84-88. Plaintiff also alleges that her physical problems have affected her mentally. TR 57; 88. Plaintiff's applications were denied both initially (TR 16; 56-57) and upon reconsideration (TR 16; 58-59). Plaintiff subsequently requested (TR 69) and received (TR 70-75) a hearing. Plaintiff's hearing was conducted on October 9, 2002, by Administrative Law Judge ("ALJ") Robert C. Haynes. TR 34-55. Plaintiff and vocational expert ("VE"), Rebecca Williams, appeared and testified. *Id.*

On October 24, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 16-25. Specifically, the ALJ made the following findings of fact:

> 1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2004.
>
> 2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3.  The claimant has cervical degenerative disc disease and mild right carpal tunnel syndrome considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b). The claimant has a history of

---

[1]The record does not specify which arm(s) or shoulder(s) had the allegedly disabling conditions. TR 57; 84-88. Plaintiff's SSI application, initial denial, and reconsideration denial appear to have been omitted from the record. TR 5-6. The "List of Exhibits" in the table of contents references them, but the Exhibit numbers have "X" marked over each entry. *Id.*

morbid obesity (5'4" and 209-220 pounds), intermittent complaints of low back pain radiating to the lower extremities, and a history of asthamatic [*sic*] bronchitis that have not been shown to impose any significant extended limitation of function during the period at issue but have been considered.

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned finds the claimant's allegations regarding the severity of her impairments and pain and the extent of her limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.    The claimant has the residual functional capacity to perform light work activity that does not require repetitive motion of the neck or repetitive use of the right upper extremity for gripping, grasping, reaching.

8.    Giving the claimant the benefit of the doubt with regard to her need for an option to sit or stand she is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

9.    The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

10.    The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

11.    The claimant has no transferable skills from any past relevant work (20 CFR §§ 404.1568 and 416.968).

12.    The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

3

13. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making and considering vocational expert testimony, there are a significant number of jobs in the national economy that she could perform. As representative examples of light exertional jobs that exist in the state of Tennessee the vocational expert cited 1,200 jobs as file clerk, 700 jobs as a library clerk,, [sic] 1,150 jobs as a messenger, 4,000 jobs as security guard, 600 jobs as an usher, and 400 jobs as a park attendant, and at the sedentary exertional level 1,000 jobs as information clerk, 1,300 jobs as receptionist, and 1,000 jobs as teacher's aid. This is a significant number.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

TR 23-24.

On November 10, 2003, Plaintiff filed a request for review of the hearing decision. TR 12. On July 22, 2004, the Appeals Council issued a letter declining to review the case (TR 8-10), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to arthritis, a disc in her neck that pressed on a nerve, and pain and fatigue in her arm, neck, shoulder, and legs. TR 16; 57; 84-88. Plaintiff also alleges that her physical disabilities have affected her mentally. TR 57.

4

**1.  Medical Records Received Before or During the Hearing**

Dr. Dilip N. Joshi examined Plaintiff on October 21, 2000, for complaints of pain in the right upper extremity, numbness in the right hand, and "discomfort" in her neck.  TR 176.  Dr. Joshi referred Plaintiff to Fentress County General Hospital for an MRI and an EMG.  *Id.*  An MRI of Plaintiff's cervical spine, dated October 26, 2000, revealed "minimal prominence of disc material just to the left of midline that slightly indents the dural sac," and "adequate neural foraminal openings."  TR 179.

Plaintiff returned to Dr. Joshi on November 6, 2000, complaining of increasing pain in her neck, pain in her right upper extremity, and "severe" headaches.  TR 175.  Dr. Joshi treated Plaintiff with analgesics and muscle relaxants, and advised her to continue physical therapy.  *Id.*

Also on November 6, 2000, Dr. Leonardo Rodriguez-Cruz examined Plaintiff for her complaint of gradually worsening neck pain, numbness in her right arm, and fatigue.  TR 171.  Plaintiff denied experiencing any lower extremity problems or trouble with fine motor skills.  *Id.*  Dr. Rodriguez-Cruz noted that Plaintiff's family history was "[s]ignificant for hypertension," and that she had a "limited range of motion of the cervical spine."  *Id.*  Dr. Rodriguez-Cruz reviewed Plaintiff's films, and noted "two separate yet small disc herniations in her upper cervical spine" that "come in contact with the spinal cord but do not significantly deform it."  TR 172.  Dr. Rodriguez-Cruz reported:

> [Plaintiff] not have any clinical signs that relate directly to her trivial disc herniations.  She is not myelopathic.  She does not have radiculopathies and does not have cervicalgia.

TR 172.  Dr. Rodriguez-Cruz opined:  "There is no surgical treatment for this, and I would be very remiss in suggesting doing a two-level cervical discectomy on a woman who is only 33."

5

*Id.* Dr. Rodriguez-Cruz recommended "conservative" treatment. *Id.*

On November 30, 2000, upon referral from Dr. Joshi, Dr. James Anderson treated Plaintiff for complaints of chronic right upper extremity pain and numbness. TR 178. Dr. Anderson conducted motor nerve conduction and sensory nerve conduction studies, and a needle EMG, and found that Plaintiff had mild carpal tunnel syndrome. *Id.*

Plaintiff returned to Dr. Joshi on December 2, 2000, complaining of increasing headache, neck pain, and pain in her right upper extremity and right shoulder. TR 175. Dr. Joshi noted that Plaintiff was in moderate distress, and that she was experiencing neck pain, pain in her right upper extremity, and degenerative arthritis. *Id.* Dr. Joshi treated Plaintiff with analgesics and muscle relaxants, advised Plaintiff to continue physical therapy, and noted that Plaintiff had undergone an EMG, but that he did not yet have the results.[2] *Id.*

Dr. William H. Leone treated Plaintiff for pain in her neck and right shoulder, from January 8, 2001, to April 2, 2001. TR 181-190. On January 8, 2001, Dr. Leone recorded that Plaintiff's left hand was "very tired and very numb," and that her pain was "constant." TR 188. Dr. Leone noted that Plaintiff demonstrated "decreased range of motion of the C-spine," as well as "Pain on flexion and extension," and "Point tenderness of C 4-5." TR 189. Dr. Leone's impression was that Plaintiff had cervical radiculopathy and cervical degenerative disc disease, for which he prescribed "Tylox qid, and Soma QHS," and scheduled a "CESI." TR 189-190.

On February 5, 2001, Plaintiff returned to Dr. Leone, who administered the first of three cervical epidural steroid injections. TR 186. Dr. Leone administered the second and third injections on March 5, 2001, and March 19, 2001. TR 182-185. On April 2, 2001, Dr. Leone

---

[2]The next record of an EMG is dated October 2002. TR 232-233.

6

refilled Plaintiff's prescriptions, and indicated that Plaintiff's condition was "constant" and "unchanged." TR 181.

On May 9, 2001, Dr. Donita Keown examined Plaintiff on behalf of the Tennessee Disability Determination Services ("DDS"). TR 191-194. Dr. Keown recorded that Plaintiff was alleging disability because of her neck, shoulder, lower back, hip, and knee pain. TR 191. Dr. Keown also recorded that Plaintiff received little relief from Tylox and Soma. *Id.* A physical examination of Plaintiff revealed "shortness of air on exertion," "full range of motion at both hips, knees, and ankles without joint crepitus," and "tenderness to palpation to upper thoracic lumbar musculature." TR 191-192. Dr. Keown noted that Plaintiff's "[e]ffort on examination is moderate." *Id.* Dr. Keown's assessment was that Plaintiff had a "mild reduction range of motion of the c-spine, limited mostly by pain," and that she "could sit, stand, or walk at least six hours in an eight hour day, routinely lift 10 to 15 pounds, [and] episodically lift 20 to 25." TR 193. Plaintiff's cervical spine scan revealed "[d]egenerative disease of the cervical spine involving C3-C4 and C5-C6." TR 194.

On May 24, 2001, Dr. James N. Moore conducted a physical Residual Functional Capacity Assessment ("RFC") regarding Plaintiff. TR 195-202. Dr. Moore found that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight hour workday; and sit for about six hours in an eight hour workday. TR 196. Dr. Moore also found that Plaintiff had unlimited abilities to push and/or pull. *Id.* Dr. Moore stated that Plaintiff could frequently perform postural activities of balancing, stooping, kneeling, crouching, and crawling. TR 197. Dr. Moore noted that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. TR 198-

7

200.

From November 10, 2000, to December 3, 2001, Plaintiff underwent six sessions of physical therapy, upon referral from Dr. Joshi, for the pain in her neck and right upper extremity. TR 203-208. The physical therapy treatment records from Fentress County General Hospital indicated that Plaintiff received "back care education," as well as moist heat, electrical stimulation, ultrasound, therapeutic exercise, and isometric therapy. TR 206. Plaintiff was discharged from treatment on December 3, 2001, without accomplishing her treatment goals, and without any plan to complete the recommended course of therapy. TR 204.

## 2. Medical Records Received After Plaintiff's Hearing[3]

The record contains treatment notes from The Pain Management Group, dated from April 2, 2001, to September 20, 2002. TR 210-230. On April 2, 2001 and July 20, 2001, Dr. Leone examined Plaintiff and refilled her medications. TR 229-230. Dr. Leone indicated that Plaintiff's conditions were cervical degenerative disc disease and cervical radiculopathy. *Id.*

On September 13, 2001, Dr. Leone noted Plaintiff's complaints of lower back pain, neck pain, and pain below her knees; he stated that Plaintiff had "two levels of herniated discs" for which she had "refused surgery." TR 227. Dr. Leone conducted a physical examination, finding that Plaintiff had a "4/5 grip in the right hand and 5/5 in the left hand," as well as "tenderness to palpation along the right trapezius muscle and suprascapular area." TR 227. Dr. Leone's impression was that Plaintiff had "[l]ower extremity pain, unclear etiology" (TR 227); and he suggested that Plaintiff see her primary care physician and a neurologist (TR 228).

---

[3]These medical records were received subsequent to Plaintiff's hearing but were part of the Administrative Record before the ALJ at the time that he rendered his decision.

On November 26, 2001, Dr. Leone examined Plaintiff for back pain, and determined that she had cervical degenerative disc disease, cervical radiculopathy, and possible carpal tunnel syndrome right upper extremity. TR 225. Dr. Leone ordered a CT scan on December 5, 2001, and changed Plaintiff's medication because she had experienced "sedation" from her previous medications. TR 223-224. On January 2, 2002 and March 1, 2002, Dr. Leone saw Plaintiff for follow-up appointments and medication refills. TR 220-222.

On March 29, 2002, Dr. Leone noted that Plaintiff reported that her neck pain had improved, but that she continued to experience "low back pain with bilateral lower extremity pain." TR 218. Dr. Leone noted that Plaintiff's physical examination revealed "[t]enderness on the right trapezius and suprascapular," but no other pain or restrictions on her range of motion. *Id.* Dr. Leone ordered another CT scan and stated that he would "consider [an] epidural steroid injection and diskography." TR 218-219. Dr. Jeffrey York, from The Pain Management Group, P.C., performed two cervical epidural steroid injections on June 28, 2002 and August 16, 2002.[4] TR 213-214.

On August 21, 2002, Dr. Leone treated Plaintiff for complaints of right upper extremity numbness, weakness, and "pain in the C7 dermatome that radiates down to her thumb and her second and third digits." TR 211. Dr. Leone noted that Plaintiff's CT scan revealed "C5-6 osteophytes on the right side without significant impingement." *Id.* Upon physical examination, Dr. Leone found that Plaintiff had "decreased sensation on the right medial aspect of her upper extremity," "decreased range of motion of the cervical spine," "positive lumbosacral muscle

_____

[4]These records label the injections as "#1" and "#3," but the record does not contain documentation of a second injection. TR 213-214.

Case 2:04-cv-00076  Document 17  Filed 06/01/06  Page 9 of 21 PageID #: 9

spasms in the right upper trapezius muscles," and "mild decrease in strength at 4/5 in the right

upper extremity." *Id.* Dr. Leone also noted that Plaintiff's right hand was "slightly cooler" than

her left, and that she performed flexion or extension of her back "with caution." *Id.* Dr. Leone

stated that he would consider surgical consultation in the future. TR 212. On September 20,

2002, Dr. Leone had a follow-up appointment with Plaintiff, and refilled her medications.[5] TR

210.

The record contains a "Medical Assessment of Ability to do Work-Related Activities

(Physical)" form from Dr. Christopher Sewell, dated October 29, 2002.[6] TR 234-236. In that

Assessment, Dr. Sewell found that Plaintiff's lifting/carrying, standing/walking, and sitting

abilities were affected by her impairment, as were her physical functions of reaching, handling,

feeling, and pushing/pulling. *Id.*

On October 31, 2002, Dr. Craig D. Berteau completed an "electrophysiology report" on

Plaintiff, upon referral from Dr. Leone. TR 232-233. Dr. Berteau stated that Plaintiff had a

history of degenerative disc disease of the cervical spine and chronic right upper extremity

radiculopathic pain, numbness, and weakness, and that she had undergone previous studies,

which showed mild Carpal Tunnel Syndrome. TR 232. Dr. Berteau recorded that Plaintiff's

hand frequently went numb. *Id.* Dr. Berteau conducted a nerve conduction study and EMG

needle study, which revealed: "[a]bnormal right median sensory response with prolonged

_____

[5]Dr. Leone did not sign this record. TR 210.

[6]This document is not mentioned in the table of contents (TR 5), nor is it mentioned by
the attorney's letter accompanying other documents received subsequent to the hearing (TR
231). The Order of Appeals Council, dated July 22, 2004, makes this document part of the
record (TR 11), but it was received after the ALJ's decision, dated October 24, 2003 (TR 13-25).

10

latency," "[n]ormal right ulnar sensory response," "[n]ormal right median and ulnar motor responses," "[n]eedle EMG with no acute denervation potentials," and "[r]are chronic denervation potentials seen in the right C6 distribution." TR 232-233. Dr. Berteau's impression was that Plaintiff had "[e]lectrophysiologic evidence of Carpal Tunnel Syndrome in the right wrist of mild to moderate severity," "[n]o electrophysiologic evidence of an acute radiculopathic process in tested units of the right upper extremity," and "[e]lectrophysiologic evidence of a chronic radiculopathic process primarily involving the right C6 distribution." *Id.*

### B. Plaintiff's Testimony

Plaintiff was born on November 15, 1966, and has a high school education. TR 37. Plaintiff testified that she had initially noticed her neck pain while she was working as a janitor. TR 38. Plaintiff stated that she had thought that her pain was a "crick," but that she went to a doctor after three days had passed and she was unable to move her head. *Id.* Plaintiff reported that her doctors had told her that she had "two bulging disks." *Id.* Plaintiff stated that she was referred to a neurosurgeon, who "wouldn't do nothing for me," and that she had "been through therapy and it just makes it worse." *Id.* Plaintiff asserted that she had attempted to "deal with it" for two years, but that "it started bothering me again real bad." *Id.* Plaintiff stated that her pain prevented her from daily activities:

> I can't use my arm for nothing. I can't peel potatoes. I can't comb
> my little girl's hair. I can't push [*sic*] my dishes up. I can't, I
> can't use it for nothing because it gets tired.

*Id.*

Plaintiff testified that she had worked from 1994 until March 2001. TR 38-39. She stated that she had worked as an assistant director at a day care center, asserting, "I worked until

11

I couldn't work no more. It got to me mentally." TR 39. Plaintiff testified that her work there had involved taking care of children and handling paperwork. *Id.*

Plaintiff stated that her right arm had caused her "trouble," and that she was right-handed. TR 39. Plaintiff asserted that her doctor had told her recently that she had a "big bone spur on [her] shoulder."[7] *Id.* Plaintiff testified that she had "knots" in her arms and legs, and stated: "My back hurts all the way across at my hips, down my legs." TR 40. She continued, "It's just hard to get around. It's like my bones are sore." *Id.* Plaintiff stated that she could not sit still, and that her medication helped her pain, but not her "arm and stuff." *Id.* Plaintiff testified that she did not want to have surgery for her back, because she had more than one herniated disc, and "when you have more than one disk it doesn't help to do it." TR 41.

Plaintiff testified about her activities on an average day, stating, "I don't hardly do anything." TR 41. She explained: "I do what housework I can do. I do a little, sit down or lay [*sic*] down or just whatever my arm will let me do." *Id.* Plaintiff continued, "It gets tired real easy and if I stand, my shoulders and stuff starts hurting so I sit down and I stay at home." *Id.* Plaintiff stated that she would spend three or four hours out of an eight hour day lying down. TR 42. Plaintiff later stated that her daily activities included "a little housework," watching television, and reading the paper "a little." TR 45. Plaintiff asserted that she drove "very little," but that her hand became "numb and stiff" when she drove. TR 45-46. Additionally, she testified that she and her husband had "a lot of trouble" because she was "so grouchy," but that she was getting counseling. TR 46. Plaintiff reported that she took "Zonegran" for her "nerves," and "Soma and Tylox four times a day." TR 46-47.

_____

[7]Plaintiff's attorney stated that this shoulder condition was "not in the record." TR 39.

12

Plaintiff testified that she had pain in her lower back, hips, right arm, shoulders, neck, and legs, as well as numbness in her fingers. TR 42. Plaintiff characterized her pain as a "five" on a scale of one to ten, because her medication "helps some." *Id.* Plaintiff also testified that her medication caused drowsiness. *Id.* When she was asked her "biggest reason" for not working, Plaintiff answered, "Because I can't use my arm for nothing ... I can't bend, stoop. I can't turn." TR 43.

The ALJ asked Plaintiff about her "principal problem" of the right arm. TR 43. Plaintiff asserted that her neck problem caused her arm condition, and also caused her shoulder condition. *Id.* Plaintiff stated that she had difficulty using her right arm to button buttons, to style her hair, and to write. TR 43-44. Plaintiff also testified that her lower back pain affected her ability to bend over. TR 44.

### C.  Vocational Testimony

Vocational expert ("VE"), Rebecca Williams, also testified at Plaintiff's hearing.[8]  TR 47-55. The VE characterized Plaintiff's past relevant work as a restaurant cook as "medium" and "skilled"; her past relevant work as an inspector in the garment industry as "light" and "semi[-]skilled"; her past relevant work in day care as "light" and "semi[-]skilled"; and her past relevant work as a janitor as "heavy" and "unskilled."  TR 47. The VE testified that Plaintiff did not acquire any transferable skills. TR 48.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in

---

[8]The hearing testimony mistakenly indicates that Plaintiff was sworn in as the vocational expert. TR 47.

the past. TR 48. Specifically, the ALJ asked the VE to consider the following limitations: "lifting no more than 20 to 25 pounds on an occasional basis, 10 to 15 pounds on a frequent basis," and the ability to "stand, walk six hours a da [*sic*] and sit six hours a day." *Id.* The VE responded that these limitations described an RFC for "light" and "sedentary" work, and that such a hypothetical claimant could perform Plaintiff's past relevant work of inspector and day care worker. *Id.* The ALJ asked what effect a "sit/stand option" would have on the hypothetical claimant's ability to perform Plaintiff's past relevant work, and the VE responded that it would preclude the performance of Plaintiff's past relevant work. *Id.*

The ALJ then modified the hypothetical to describe a claimant who "could lift 20 pounds occasionally, ten pounds frequently, stand and walk six hours, sit six hours, and have reduction in postural activities at the frequent level." TR 49. The VE responded that these limitations "would not have any effect on past work." *Id.*

The ALJ further modified this hypothetical to assume "some low back problem which does affect the ability to bend and twist, some effect on the waist of motion activity," "to assume that we would also limit the lifting as I suggested to 20 pounds," and to "limit the total standing and walking to no more than four hours a day." TR 49. The VE opined that, in the State of Tennessee, there were approximately 2,400 file clerk positions, 1,400 library clerk positions, and 2,300 messenger positions, all of which would be appropriate for the hypothetical claimant. *Id.*

The ALJ again modified the hypothetical, positing "a right-hand dominant individual with a reduced capability of using the right, right upper extremity," and "an individual who can use for minimal purposes the use [*sic*] of the right upper extremity similar to what [Plaintiff] has testified." TR 50-51. The ALJ added that the hypothetical claimant could "perform some

14

activity but can't sustain for prolonged periods, those sorts of things such as reaching, extending, pushing and pulling with the right upper extremity," and that the hypothetical claimant needed to "avoid those kind of positions which may require repetitive neck motion." *Id.* The VE responded that the file clerk and library clerk positions would be reduced "by at least 50 percent," but that other positions would remain available, such as 4,000 security guard positions, 600 usher positions, and 400 parking lot attendant positions. *Id.* The VE added that 1,000 information clerk positions would also be available at the sedentary level, as well as 1,300 receptionist positions, and 1,000 teacher aide positions. *Id.*

Finally, the ALJ asked the VE how "greater than moderate pain" would affect the hypothetical claimant's ability to work. TR 51. The VE responded that such a person would not be able to work "on a continuing, ongoing basis," and that this limitation affected all available work. *Id.*

### III.  CONCLUSIONS OF LAW

#### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been

15

further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's

16

age, education, and work experience, any other relevant work that exists in the national economy

in significant numbers regardless of whether such work exists in the immediate area in which

Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he

or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[9] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175,

---

[9]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in 1) failing to consider an August 5, 2003 letter from her attorney that attached an updated Progress Note from The Pain Management Group dated October 16, 2002, and an MRI dated July 23, 2003; 2) failing to give appropriate weight to particular consultations and examinations; and 3) failing to find that Plaintiff's impairments, including her "morbid obesity," met or equaled a Listing. Docket Entry No. 13. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be

18

reversed, or, in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying,
> or reversing the decision of the Commissioner of Social Security,
> with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

Plaintiff argues that the ALJ erred in not considering an August 5, 2003 letter from her attorney that attached an updated Progress Note from The Pain Management Group dated October 16, 2002, and an MRI dated July 23, 2003. Docket Entry No. 13. Plaintiff's counsel states that he submitted the August 5, 2003 letter and attachments to both the ALJ and the Appeals Council subsequent to Plaintiff's hearing, but prior to the ALJ's issuance of his decision. *Id.* There is no indication in the Record, however, that either the ALJ or the Appeals Council received those documents, as they have not been incorporated into the Administrative Record before this Court. Plaintiff has attached a copy of the letter dated August 5, 2003, as well as The Pain Management Group Progress Note dated October 16, 2002, and MRI dated July 23, 2003, to her Motion for Judgment on the Administrative Record. *See* Docket Entry No. 13.

19

The October 16, 2002 Progress Note from The Pain Management Group recounts

Plaintiff's complaint and treatment histories, and indicates:

> **PHYSICAL EXAMINATION:** ... decreased range of motion of her cervical spine in all directions, flexion and extension and lateral rotation. She has decreased strength right upper extremity 4/5. She does still have the unresolving circular macular lesions on her right upper extremity. She states this is from nerves, but these are not on her left arm. She states her right hand is cold to the touch. She has deep tendon reflex 2/4 biceps, triceps tendon
>
> **IMPRESSION:**
> 1. Cervical degenerative disk disease.
> 2. Cervical radiculopathy right upper extremity in the C5-7 dermatome.
> 3. Osteophytic spurring C5-6 one [*sic*] the right side without foraminal impingement.
> 4. Right upper extremity weakness and numbness.

Docket Entry No. 13 (bold and capitalization original).

Plaintiff's July 23, 2003, MRI of the cervical spine revealed:

> Bone marrow signal is within normal limits. The C2-3, C3-4, and C7-T1 disks are unremarkable. The C4-5 disk demonstrates a moderately large focal central disk protrusion which impinges upon the cord. C6-7 level shows a mild broad-based posterolateral protrusion to the left. The cord is deviated at the C4-5 and C5-6 levels by the disk protrusions. There is no focal altered signal within the cord. The canal is widely patent at the other levels.
>
> *Impression:*
>
> *#1 C4-5 central disk protrusion which impinges on the cord.*
>
> *#2 C5-6 central disk protrusion which impinges on the cord.*
>
> *#3 Small broad-based protrusion C6-7 posterolateral to the left which does not appear to impress upon cord.*

Docket Entry No. 13 (italics original).

As has been noted, the August 5, 2003 letter that included The Pain Management Group

Progress Note dated October 16, 2002, and MRI dated July 23, 2003, does not appear to have been received or incorporated into the Record by either the ALJ or the Appeals Council. Significantly, Plaintiff's July 23, 2003 MRI demonstrates that, almost one year after her hearing, she had two disc protrusions that impinged upon her cord. The undersigned is unable to determine whether this information (or the other information contained in these documents) would have had a reasonable probability of impacting the opinions of the VE, ALJ, or Appeals Council. Accordingly, remand is warranted.[10]

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be GRANTED, and that this action be REMANDED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

---

[10]Because the undersigned recommends that this action be remanded, the undersigned finds it unnecessary to address Plaintiff's remaining statements of error.

21